RED WING FLOUR CO., INC., *v.* UNITED STATES

No. 4669.—Invoices dated Budapest, Hungary, August 8, 1937, etc.
Certified August 9, 1937, etc.
Entered at New York, August 19, 1937, etc.
Entry No. 724341, etc.

(Decided October 30, 1939)

*Strauss & Hedges* (*Eugene F. Blauvelt* of counsel) for the plaintiff.
*Webster J. Oliver*, Assistant Attorney General (*Frank E. Carstarphen* and *Daniel I. Auster*, special attorneys), for the defendant.

KEEFE, Judge: These appeals for reappraisement involve importations of baker's compressed yeast from Budapest, Hungary. Two qualities were imported. The so-called "normal" quality was invoiced at $3.50 per barrel of 100 pounds and the "strong" quality at $3.80 per barrel, packing and insurance included. The consular invoices disclose that freight was added to the price at the rate of $2 per 100 pounds, and deducted upon entry as nondutiable. Reappraisement 123783–A, covering merchandise shipped on June 17th, 1937, was entered at a United States selling price of 6½ cents per pound, less expenses 8 per centum, less freight $.0187 per pound, less 20 per centum duty applicable to yeast under paragraph 1558, act of 1930. The remainder of the entries covered by the reappraisements herein was entered as invoiced. The merchandise was appraised upon the basis of United States value at $4.04 per hundred pounds, both qualities of yeast being appraised at the same price.

The question before me therefore is whether or not there is a foreign or export value for the merchandise.

The importer testified at length and was very minutely cross-examined by Government counsel. He established by his testimony that he had no special agreement with the exporter to be the sole representative in the United States for the exporter's yeast product; that while in Budapest he visited four manufacturers and obtained prices for export of yeast to the United States; that the prices obtained were all about the same; that he elected to purchase his merchandise

from the Krausz-Moskovits, Ltd., the shipper herein; that purchases were made upon a cash basis through letters of credit; that the prices shown upon the consular invoices were the prices paid; that the usual wholesale quantity of yeast for export was one carload or 10,000 pounds; that to his knowledge four other firms in New York purchased yeast in Hungary at less than $6 landed in New York; and that he had no knowledge concerning the foreign sales of yeast except that yeast sold for home consumption was a different grade.

The Government moved in two special agent's reports of an investigation of the foreign and export value of yeast in Hungary, the reports of investigations having been confined to the exporter's establishment and an inspection of the books of the company and records of sales. From these reports it is disclosed that the yeast exported to the importer herein is not specially produced for the United States market but is the regular product of the factory and is the yeast as it is taken from the mixing tubs with the addition of certain secret ingredients to preserve its freshness; that the terms of sale granted to the importer under the conditions of a freely offered price were at a unit price of 3 cents per pound, packing and wooden drums, inland and sea freight to c. i. f. New York City, including all other costs and charges at a unit addition of 2 cents per pound, net cash against delivery; that after shipment of March 13, 1937, the unit price has been increased to $3\frac{1}{2}$ cents per pound, the c. i. f. charges remaining the same as before; that after June 26, 1937, there was a new quality produced for shipment known as "strong" at an advance of 30 cents per hundred pounds; that compressed yeast identical to that exported to the United States is not sold in Hungary; that under the law of Hungary 8 per centum of water must be included in the home product and the yeast sold in the home market is cut into rectangular shapes, wrapped in double-thin paper, the outer sheet of which is stamped with the name of the manufacturer, while the yeast for export is as manufactured with the addition of a preservative. The report of February 24, 1938, further discloses that the importer herein is not the exclusive United States customer of the manufacturer; that offers were made to four other firms; that offers so made were comparable to the prices granted the importer; that the importer of the yeast herein actually paid $5.80 c. i. f., New York, for the "strong" quality and $5.50 c. i. f., New York, for the "normal" quality, all costs c. i. f., New York, included; and that the usual wholesale quantity for export of compressed yeast was 10,000 pounds for "normal" quality and 4,000 pounds for "strong" quality.

In the course of the trial counsel for the plaintiff conceded that if the proper basis of value was found to be the United States value, that the appraised value was a correct representation thereof.

From the evidence adduced as corroborated by the special agent's reports, I find the following facts:

1. The merchandise in question consists of compressed yeast in two qualities, to wit, "normal" and "strong."

2. That the compressed yeast sold for home consumption is not similar to, nor comparable with, the yeast sold for export, and therefore there is no foreign value for home consumption for the yeast in question.

3. That the yeast in question is freely offered for sale for export to the United States in the usual wholesale quantities and in the ordinary course of trade.

4. That Budapest is the principal market for the sale of said yeast in Hungary.

5. That the usual wholesale quantity for export to the United States is 10,000 pounds of the "normal" quality and 4,000 pounds for the "strong" quality.

6. That the price at which such or similar merchandise was freely offered for sale to all purchasers in the principal market of Hungary on the dates of exportation, to wit, June 26, 1937, to December 10, 1937, in the usual wholesale quantities and in the ordinary course of trade, including the cost of all containers and coverings incident to placing the merchandise in condition, packed, ready for shipment to the United States, and including inland freight charges to seaport, ocean freight and insurance, etc., was for the "normal" quality $5.50 per 100 pounds, and for the "strong" quality $5.80 per 100 pounds, less nondutiable c. i. f., New York, charges of ocean freight, insurance, and consular fee.

7. That the export value of the merchandise herein is as set forth in paragraph 6 of the findings of fact.

Therefore I conclude, as a matter of law, that the dutiable value of the merchandise is as set forth in paragraph 6 of the findings of fact and judgment will be entered accordingly.